## A01A2148. POOLE v. THE STATE.
(562 SE2d 239)

BLACKBURN, Chief Judge.

Following his conviction on one count of rape, one count of kidnapping with bodily injury, and two counts of burglary, Larry James Poole appeals his conviction and the denial of his motion for new trial. He asserts that his *Miranda* rights were violated and that the evidence was insufficient to support his conviction. We affirm.

In the summer and fall of 1997, law enforcement officers in adjoining portions of Cobb and Douglas Counties received numerous complaints from older women, many of whom lived alone, about an intruder who attempted to, and sometimes did, gain entry to their homes late at night. Some of these victims reported that the intruder had not only stolen money and valuables from their homes but also had fondled or groped them as they lay in their beds. Complaints received by the police showed an escalating pattern of violent behavior and at least three women reported that they had been raped by the assailant.

Douglas County formed a task force in an attempt to solve the crimes which occurred in Lithia Springs. Members of the task force soon learned from officers in nearby Austell that that area of Cobb County was also experiencing an increase in break-ins, burglaries, and sexual assaults against older, single females. The intruder almost always gained entry to the homes by breaking glass from a rear window or door or removing the glass panes from jalousie windows. Police also suspected that the intruder lived in the area and went by foot or bicycle because no one had ever reported hearing a motorized vehicle at the time of the crimes.

"On appeal the evidence must be viewed in the light most favorable to support the verdict, and appellant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility." *Mulvey v. State*.[1] Viewed in the light most favorable to support the verdict, the jury was authorized to find the following facts.

On August 9, 1997, J. P., a 73-year-old widow living in Lithia Springs, was awakened when the overhead light in her bedroom

[1] *Mulvey v. State*, 250 Ga. App. 345, 346 (1) (551 SE2d 761) (2001).

flashed on and then off. A light in the kitchen allowed her to see the silhouette of a person walking from her bedroom with a jewelry box which had been taken from a table near her bed. Thinking at first that it was her granddaughter, who lived with her, she called out to her, but after she realized that the person was not her granddaughter, she called for help. When the Douglas County officers arrived, they found that the screen near the back door had been torn and jalousie glass windows in her study had been removed, thus allowing the intruder to enter her house. Officers also found a bicycle in the victim's backyard.

On August 19, 1997, N. B. suddenly awoke with the feeling that someone had touched her. As she rose from the living room couch on which she had been sleeping, she thought she saw someone go from the living room to the kitchen. Looking around, she noticed that her porch light was not on, and when she attempted to turn it on, it would not come on. She then walked from the front door to the kitchen, stopping when she noticed that the patio door curtains were being sucked outdoors. When she walked over to the door and pulled the curtains back, she was face to face with an unknown intruder who was standing in the open doorway. When the man's hand came toward her, she grabbed the door and the intruder left. Frightened, N. B. ran next door, and her neighbor called the police. The police discovered that the intruder had gained entry by removing jalousie windowpanes. The next day, while cleaning up broken glass outside her window, N. B. found a baseball cap, rolled up and stuffed into a bush. Inside the cap were a package of crackers, some lottery tickets, and a set of keys, which she turned over to the police.

On September 6, 1997, P. F. was asleep in her ground floor apartment in Austell. She was awakened by an attacker who was on top of her, covering her mouth and smothering her with his hands and telling her not to scream. Pinning her with one hand, he removed her clothes with the other and raped her. When the attacker moved his hand from her mouth, P. F. screamed for her son, who was not there, and the attacker jumped up and went into the bedroom to see if anyone else was in the house. Eluding his grasp, she ran to her neighbor's house, screaming for her to call the police. P. F. was taken to the hospital within minutes; a rape examination was performed by medical personnel, who were able to recover semen left by the rapist.

Early on the morning of October 18, 1997, B. H. was alone in her Lithia Springs home when her doorbell rang. She went to the carport door and attempted to turn on the light, but it was not working. She opened the door and encountered a man who claimed that he had car trouble and asked to use the telephone; he gave her a number to dial, and she dialed the number for him and handed him the telephone. He told her that the number was busy. He then asked for water; she

gave him a cup of water and then shut the door. As she turned from the door, the man came through the door and grabbed her from behind, covering her nose and mouth with his hand. He then pushed her down the hall into a bedroom and covered her with pillows so that she could not see. After looking through the house, the man demanded money, and B. H. directed him to a jar which contained $300. After looking through the house again, the man returned to the bedroom and raped B. H.

After raping B. H., the attacker asked her to take him to Villa Rica; she refused, and he left. B. H. then called the police who arrived and began an investigation. The police photographed a shoe impression left on the kitchen floor by the attacker and recovered two hairs from the victim's bed.

After the rape of B. H., Investigator Tommy Wheeler, one of the members of the Douglas County task force, began a review of all of the evidence that had been compiled in the Lithia Springs and Austell cases. Wheeler determined that the lottery tickets found by N. B. in the baseball cap had been purchased at a liquor store on the county line between Lithia Springs and Austell. The tickets all played the numbers 4-2-3. Conversations with employees at the liquor store revealed that Poole, whose birthday is April 23, was routinely known to play those numbers. Wheeler drove to the home of Poole's mother, taking with him the keys recovered along with the lottery tickets found at N. B.'s house. When he showed them to Poole's mother, she identified them as keys she had given to Poole. One of the keys fit Mrs. Poole's front door, and the other key fit the car parked in her driveway. Wheeler also learned that Poole usually stayed with his mother in her mobile home; that home was about 500 yards through the woods from B. H.'s house.

Wheeler brought Poole in for interrogation. Poole came in voluntarily and, after being advised of his rights, agreed to talk with the police and waived his *Miranda* rights.

Poole confessed to the burglary of J. P.'s home, telling Wheeler that he had taken her jewelry box. The police had actually encountered Poole near the scene shortly after the burglary of J. P.'s house. Following that burglary, the police had set up a perimeter in the vicinity of J. P.'s house. After about 30 minutes, an officer had encountered Poole coming out of a wooded area and heading away from J. P.'s house. In response to questioning, Poole had said that he had just left his uncle's house; the officer took him to the house and released him after the uncle corroborated his story. About a month after the J. P. burglary, the victim's jewelry box was found in bushes near the spot at which the officer had first encountered Poole. Poole admitted to Wheeler that he had previously lied to him and that he had thrown the jewelry box into the bushes just before encountering

the officer on August 9, 1997. Poole also admitted that the bicycle found at J. P.'s home belonged to him. The confession and these admissions were admitted at trial without objection.

Poole did not admit to the rape of B. H. during this first of two videotaped interviews. The interview was interrupted for the processing of Poole. Poole provided hair and blood samples to the police at that time.

Later, Poole indicated that he wished to speak further with Wheeler. During this second videotaped interview, Poole admitted to Wheeler that he had committed the crimes at the home of B. H. He described to Wheeler how he had unscrewed the lightbulb on the carport, entered the home through the carport door, and then raped and robbed B. H. An independent forensic identity testing lab conducted mitochondrial DNA sequencing on the hairs recovered by the crime scene specialist in B. H.'s bed and found that the DNA sequence in the hair samples matched the DNA sequence in Poole's blood. In addition, testimony was admitted that the pattern from Poole's tennis shoes matched the pattern left on B. H.'s kitchen floor by the shoes of her attacker.

Poole was charged with the rape and kidnapping with bodily injury, and burglary of the home, of B. H. in Lithia Springs (Counts 1, 2, and 3) and the burglary of the home of J. P., also in Lithia Springs (Count 4). Poole was convicted on all counts.

The trial court admitted evidence of the burglary of N. B. and the rape of P. F., the Cobb County crimes, as two prior similar transactions. See *McGee v. State*;[2] *Williams v. State*.[3] Poole admitted to Wheeler that he had committed the burglary of N. B.'s home and that he had left behind his hat, keys, and lottery tickets. He acknowledged that he often played the lottery numbers 4-2-3. This statement was also admitted without objection.

The DNA material recovered in the rape examination of P. F. was compared to Poole's known DNA; a DNA forensic chemist for the Georgia Bureau of Investigation concluded that they matched and that the odds of someone other than Poole being the donor were one in ten billion.

1. Poole argues that the trial court erred in admitting statements he made after he asserted his right to remain silent. Before admitting Poole's confession, the trial judge held a *Jackson-Denno*[4] hearing. At that hearing, Investigator Wheeler of the Douglas County Sheriff's Department testified that on the night of November 10, 1997, he went to the home of Poole's mother and verified that a set of

---

[2] *McGee v. State*, 267 Ga. 560, 562-564 (2) (480 SE2d 577) (1997).

[3] *Williams v. State*, 261 Ga. 640, 641-643 (2) (409 SE2d 649) (1991).

[4] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

keys found at the site of one of the burglaries had been in Poole's possession. He then drove around until he found Poole and took him to the sheriff's office. Wheeler advised Poole of his *Miranda* rights, and Poole agreed to answer questions. Poole was not handcuffed or shackled during the interview, was not suffering from any injuries or illnesses, understood the questions asked him, was not threatened or intimidated in any way, and was not offered any benefit or reward, or hope of either, in exchange for his cooperation.

The first part of the interview lasted four and one-half hours. During the first few hours of the interview, Poole admitted to Wheeler that he had committed both the N. B. and the J. P. burglaries. Toward the end of the first part of the interview, Detective Martin of the Cobb County Police Department began questioning Poole. In response to a question, Martin confirmed that Poole had the right to remain silent. At this point, Martin ceased asking questions and left the interview room. Wheeler then asked Deputy Mark Williams to take Poole to processing so that he could be booked.

Shortly after Poole left the interview room, Deputy Williams returned to tell Wheeler that Poole had said that he wanted to speak further with Wheeler. When Poole returned, he began asking Wheeler questions about his situation, and within a short time he confessed that he had committed the rape and kidnapping of B. H. and the burglary of her home.

In addition to hearing testimony from Investigator Wheeler, Betty Poole, the appellant's mother, Deputy Williams, and Poole himself, the trial judge viewed portions of the tape relevant to the issue of the voluntariness of Poole's confessions. The trial court viewed the entire interview by Wheeler that occurred after Poole asked to speak with him.

At the *Jackson-Denno* hearing, the trial judge ruled that, as to the first part of the interview, Poole was appropriately and adequately advised of his *Miranda* rights; that he had voluntarily waived those rights and spoken with the officers; that there was no credible evidence that Poole invoked his right to counsel; and that there had been a scrupulous observation of his right to remain silent after Poole had indicated that he had a right to remain silent. As to the second part of the interview, the trial judge found that it was the result of a request by Poole to speak to the officer. As Poole had voluntarily initiated a continuation of his conversation with Wheeler, he thereby waived his right to remain silent. Poole contests only the trial judge's ruling as to his second conversation with Wheeler. We find no error in the trial court's ruling.

"Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal. [Cits.]" (Punctuation omitted.)

*Snipes v. State.*[5] Given this standard, it is clear that the evidence supports the trial court's findings in favor of admitting the confession. "The right to silence is not protected by a per se rule of 'permanent immunity' against further police-initiated interrogation. [Cits.]" (Punctuation omitted.) *Larry v. State.*[6] As the United States Supreme Court stated in *Michigan v. Mosley,*[7]

> a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.

*Id.* at 102.

2. Poole contends that there was not sufficient evidence to support his convictions for the rape and kidnapping of B. H. and the burglary of her home (Counts 1, 2, and 3 of the indictment).

We find ample evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Poole was guilty of the rape, kidnapping, and burglary with which he is charged in Counts 1, 2, and 3. *Jackson v. Virginia.*[8]

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED MARCH 15, 2002.

*Monica T. Myles, Virginia W. Tinkler,* for appellant.
*David McDade, District Attorney,* for appellee.

---

[5] *Snipes v. State,* 188 Ga. App. 366, 368 (2) (373 SE2d 48) (1988).
[6] *Larry v. State,* 266 Ga. 284, 286 (2) (a) (466 SE2d 850) (1996).
[7] *Michigan v. Mosley,* 423 U. S. 96 (96 SC 321, 46 LE2d 313) (1975).
[8] *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).